WARD, Judge.
Ronald Tircuit appeals the dismissal of his personal injury suit against the Board of Levee Commissioners of Orleans Levee District. We affirm.
Tircuit was injured on the Seabrook Bridge in New Orleans shortly before midnight on August 13, 1982. The Seabrook Bridge, built in 1967, spans the Industrial Canal in eastern New Orleans. It is a twin span bridge, 2100 feet long. The bridge rises toward the center where it opens upward to allow the passage of water traffic through the Industrial Canal. It carries vehicular traffic on two 28 foot roadways, separated by a raised median. The roadway in each direction is striped to form two twelve foot lanes with a two foot offset on either side. There is neither a shoulder nor an emergency lane on the bridge. The eastbound lanes of the bridge feed in from *1138 Leon C. Simon Boulevard and Lakeshore Drive. Leon C. Simon, on which Ronnie Tircuit was traveling, feeds directly into the bridge. Lakeshore Drive approaches the bridge from the left and feeds into the bridge from a ramp which crosses over all lanes of bridge traffic before merging into the outside of the right eastbound lane. The Lakeshore Drive overpass ramp goes over the bridge approach at a nearly per-pindicular angle just as the bridge begins its incline and then curves to merge into the right lane of the bridge approximately one-third of the way up the incline.
Tircuit, eighteen years old at the time, was riding his motorcycle home from a boxing match when the accident occurred. He had consumed several beers in the course of the evening. His route was familiar to him. He was traveling from Leon C. Simon Boulevard across the bridge when he came upon an automobile which had stalled in the right-hand, eastbound ascending lane of the bridge about 450 feet beyond the overpass just before the merger of Lakeshore Drive. Tircuit, riding on the extreme right of that lane, was unable to swerve around the car. He hit its left rear fender with a glancing blow, severely injuring his right leg. The injury required surgical amputation of Tircuit’s leg just below the knee.
The investigating Levee Board Police officer questioned the driver of the disabled vehicle at the scene of the accident and obtained his name as well as that of the owner of the car. Neither, however, could be found for service of process in Tircuit’s lawsuit. Tircuit, therefore, proceeded through trial and to this appeal only against the Levee Board, contending that the Board is strictly liable because the bridge design and construction created an unreasonable risk of harm and alternatively contending that the Board is liable for negligent failure to discover and remove the stalled vehicle from the bridge.
STRICT LIABILITY
To prevail on a claim of strict liability under Civil Code Article 2317 an injured plaintiff must prove that the thing which caused the damage was in the defendant’s custody, that the thing had a vice or a defect — that is, a condition which created an unreasonable risk of injury — and that the defect caused his injury. Loescher v. Parr, 324 So.2d 441 (La.1975).
Unquestionably, the bridge is under the control of the Levee Board, and Tircuit alleges several defects in design and construction of the Seabrook Bridge which he claims rendered it unreasonably dangerous and caused his injuries. He urges that we hold as design defects of the bridge: (1) the lack of an emergency lane; (2) a vehicle operator’s obstructed view of the roadway caused by the overhead ramp and the confusing lighting illusion created by multiple lights and the shadows from the ramp; and (3) the bridge tender’s obstructed view of a portion of the roadway. Additionally, he asserts that these conditions, in conjunction, create a situation which is unreasonably dangerous. We do not believe Tircuit has shown that any of these conditions of the Seabrook Bridge, individually or together, constitute a defect which caused his injuries, and therefore, the Trial Judge correctly found the Levee Board not liable on a strict liability theory.
Tircuit first argues that the bridge is defective because it does not have an emergency lane for disabled vehicles. The thrust of this argument is that the lack of an emergency lane caused Tircuit’s damages because, if the stalled car had been in an emergency lane rather than in the travel lane, the accident would not have happened. This “but-for” theory of cause-in-fact may be correct, but it satisfies only the first element of Tircuit’s burden of proof. He still must prove his allegation that the lack of an emergency lane is a defect. That allegation is refuted by the testimony of the defendant’s expert, William B. Conway, a civil engineer who specializes in bridge design and transportation engineering. Conway testified that the width of the travel lanes and offset on the bridge meets the Louisiana Department of Highways design standards which were in *1139 effect when the bridge was built as well as the current American Association of State Highway and Transportation Officials (AASHTO) standards. He stated that res-triping the roadway, as plaintiff’s expert suggests, to form two narrower travel lanes with no offset and an emergency lane would violate “strong recommendations” of the design standards. The present width of the travel lanes, Conway testified, avoids a tunnel effect of driving too close to the side barriers of the bridge, a hazard because it induces drivers to move toward the center of the bridge into the other lane. Moreover, even were we to agree with Tir-cuit that the Seabrook Bridge should have been designed with an emergency lane, the evidence sustains a finding that the stalled car which Tircuit hit had not been stopped on the roadway for more than a very few minutes—not long enough for its driver to obtain assistance in moving it to an emergency lane. Hence, Tircuit has not shown that the alleged defect actually caused his injury. We believe the Trial Court was correct; we hold that the lack of an emergency lane on the Seabrook Bridge is not a design defect which caused Tircuit’s injuries.
Tircuit secondly contends that the bridge is defective because the view of a motorist approaching the bridge, as he was, on Leon C. Simon Boulevard is obstructed by the Lakeshore Drive ramp that crosses over the bridge approach. He asserts that the overhead roadway blocks the view of a portion of the bridge incline creating a blind spot for motorists approaching the bridge. As a consequence of this alleged defect, Tircuit testified that he did not see the stalled car in the lane ahead of him until it was too late to avoid the collision. The Levee Board argues that Tir-cuit’s inattention and intoxication were the reason that he did not see the car ahead. The Levee Board’s expert, Mr. Conway, conducted tests and submitted into evidence photographs which show visibility and stopping sight distances on the bridge approach. He calculated a stopping sight distance, that is, the distance required for a driver to stop after seeing an object, of 1200 feet at the scene of Tircuit’s accident. He then posted a flagman on the bridge in the location of the stalled car and took photographs from various distances back along the Leon C. Simon Boulevard approach to the bridge. Those photographs show that an object on the bridge in the position of the stalled car was continuously visible from at least 1250 feet away and that the overpass would have obstructed the car only from a distance far in excess of that required for a prudent motorist to stop or go around it safely. Hence, we again believe the Trial Court was correct; and we hold that the overpass crossing the bridge approach is not a defect which caused Tircuit’s damages.
A related argument which Tircuit makes is that, because the accident occurred at night, the shadows cast by the overpass upon the bridge approach below it obscured his view of the disabled car which, he testified, had no lights on it. This argument lacks merit because the car was not stopped under the overpass, but some 450 feet beyond it on the bridge which is illuminated by overhead lighting from both sides of the roadway. Moreover, the Levee Board’s expert evaluated the night lighting level on the bridge at the point where the car was stopped and found that it exceeded the AASHTO standards for both intensity and uniformity.
Tircuit’s final claim of a design defect requires that we look at the Seabrook Bridge not from the perspective of an approaching motorist, but from the perspective of the bridge tender who routinely notifies the Levee Board Police when he sees a disabled vehicle on the bridge. Tir-cuit claims that the bridge was defectively designed because a car in the location of the car which he hit—in the right eastbound lane just before the Lakeshore Drive merger—would not be visible from the bridge tender’s tower; it would be obscured by the railing of the ramp where Lakeshore Drive merges into the bridge. The photographic evidence shows that this “blind spot” does indeed exist. It is not a *1140 defect, however, because it does not create an unreasonable risk of harm. The bridge tender does not depend upon visual observation of that spot to determine that a car is stopped there. One of the bridge tenders testified that if a car is stopped in the blind spot, he can see the traffic backed up behind it as well as the cars going around it and by these indications, knows of an obstruction of the roadway. Additionally, the Levee Board is not dependent solely upon the bridge tender to monitor the bridge for disabled vehicles. The Levee Board Police also have that responsibility. Hence, we find the evidence sustains the Trial Judge’s ruling, and we hold that the bridge tender’s obstructed view of the bridge is not a defect which would render the Levee Board strictly liable.
Tircuit’s final argument on a strict liability theory is that, even if none of the conditions of the Seabrook Bridge discussed above individually render the bridge defective, acting in conjunction they produce a situation in which accidents are likely to occur. Although such a theory has received some judicial recognition, we do not believe its application is proper in this case. The evidence, as a whole, does not show that the bridge was unreasonably dangerous to a motorist using the care and prudence one would ordinarily employ in crossing the Seabrook Bridge at night.
NEGLIGENCE
Tircuit’s negligence claim against the Levee Board is based upon its alleged breach of the duty to discover and remove the stalled car from the bridge.
There is no doubt but that the Levee Board, as the authority responsible for maintenance and operation of the Sea-brook Bridge, has a duty to remedy hazardous conditions on it. In order to prove a breach of that duty in this case, it must be shown that the Levee Board had actual or constructive notice of the vehicle stalled on the bridge and sufficient opportunity to remove it or at least to warn motorists of its presence, and despite that notice and opportunity, the Board failed to act. State Farm Mutual Automobile Insurance Co. v. Slaydon, 376 So.2d 97 (La.1979).
There is no credible evidence that the Levee Board had actual notice of the vehicle stalled on the Seabrook Bridge on the evening of August 13, 1984 until midnight when the Levee Board Police were called to the scene of Ronnie Tircuit’s accident. The question before us, therefore, is whether the vehicle had been on the bridge for a period of time sufficient to find that the Levee Board should have known of its presence. Evidence on this point is conflicting.
Two acquaintances of the plaintiff who crossed the bridge shortly after seven p.m. testified that there was an old, dark-colored car stopped in the same position on the bridge as the car which the plaintiff later struck. Contrary to this testimony, the bridge tender who worked from three to eleven p.m. testified there were no stalled cars on the bridge during his shift. The bridge tender who came on duty at eleven p.m. testified that there was no indication of a stalled car on the bridge before the accident. He also stated that the bridge had been raised to allow passage of a barge just minutes before the accident. A Levee Board Police officer who worked three to eleven testified that she had driven across the bridge several times during her shift and remembered seeing no disabled vehicles. The Levee Board Police officer who investigated the accident testified that he crossed the bridge twice between eleven o’clock and midnight and did not see a car stopped until he was called back to the bridge because of the accident. He testified that the bridge had been raised between the time of his second crossing and the accident.
Given this evidence, it is quite reasonable to believe that the car Tircuit hit had stalled when it stopped for the raised bridge, and therefore, had been obstructing the roadway for just a matter of minutes before the accident. We cannot say that the car had been stopped on the bridge for a sufficient time to charge the Levee Board *1141 with “knowledge” of its presence or to find that the Board was negligent in not discovering the obstacle to traffic. We cannot say the Trial Court’s findings of fact were manifestly erroneous, and we believe he correctly found the Levee Board not negligent for failure to discover and remove the disabled vehicle from the Seabrook Bridge.
Judgment by the Trial Court affirmed. All costs to be paid by Ronald Tircuit.
AFFIRMED.